511 P.2d 783

**ABBIE URIGUEN OLDSMOBILE BUICK, INC., a corporation, Plaintiff-Appellant,**

v.

**UNITED STATES FIRE INSURANCE COMPANY, Defendant-Respondent.**

No. 11226.

Supreme Court of Idaho.

July 3, 1973.

Paul M. Beeks, of Kramer, Plankey, Smith & Beeks, Twin Falls, for appellant.

R. B. Rock, of Moffatt, Thomas, Barrett & Blanton, Boise, for respondent.

SHEPARD, Justice.

This case results from an insurance company's denial of policy coverage for punitive damages. The insured brought this action seeking recovery of attorneys fees incurred as a result of the company's prospective denial of the punitive damage claim. Summary judgment was entered in favor of the company. We reverse.

The first question presented herein is whether an insurance company is obligated, under a blanket automobile liability policy, to provide coverage of punitive damage claims arising out of an automobile accident; or whether, conversely, public policy in Idaho precludes such coverage. The second issue is whether the company's prospective denial of coverage against the punitive damage claim was a breach of the insurance contract which entitled the insured to retain his own counsel and thereafter recover his attorneys fees.

On May 27, 1970 one George Green, Jr. was driving an automobile owned by Abbie Uriguen Oldsmobile, Inc. Joe Uriguen was a passenger in the car. The automobile was involved in an accident in which two persons were severely injured.

Those injured brought suits against Green, Joe Uriguen, doing business as J & U Auto Sales, and Abbie Uriguen Oldsmobile, Inc. alleging that Green was operating the automobile "in a negligent, heedless and reckless manner while under the influence of intoxicating liquor"; that Green was driving the automobile with the permission of the Abbie Uriguen Corporation; and that the Uriguen Corporation had "full knowledge of the fact that the defendant George Green, Jr. was driving under the influence of intoxicating liquor at the time he was given permission to drive said automobile."

Joe Uriguen's relationship to this accident is obscure, to say the least, since he is

alleged to be a resident of Cassia County, Idaho and operating an automobile sales business in the City of Burley in Cassia County, while Abbie Uriguen Oldsmobile, Inc., is alleged to be a corporation with its principal place of business in Twin Falls, Idaho. Joe Uriguen is not alleged to be an owner of the automobile but only a passenger; however, it is alleged that the automobile was being used for "business purposes" of Joe Uriguen.

We note that the two law suits by the injured persons arose out of substantial injury to them because the record reveals that the law suits were settled for $39,500. The record is somewhat ambiguous regarding the amount of the claim for punitive damages asserted in those actions; it is either $50,000 or $150,000.

Uriguen Corporation tendered the defense of the two suits to its liability insurance carrier, defendant-respondent U. S. Fire Insurance Co., Inc. U. S. Fire's attorney wrote Uriguen Corporation that while U. S. Fire would provide a full defense to the two law suits it would not cover any awards of punitive damages. The letter states:

"This letter is written to inform you that in the event the plaintiffs are successful in recovering punitive damages against Abbie Uriguen Oldsmobile Buick, Inc., a corporation, that such damages will not be paid by your liability insurance carrier for the reason that it is against public policy for an insured to obtain coverage for this type of damage. *You are therefore urged to employ counsel of your choice and at your own expense to protect your interests with respect to plaintiffs' claim for punitive damages in each case.*" (Emphasis supplied)

Uriguen thereafter retained its own legal counsel to guard its interests regarding the punitive damage claims. Correspondence was exchanged between attorneys for U. S. Fire and Uriguen Corporation. A motion to dismiss and strike the allegations of the complaint relating to punitive damages was denied. Counsel for U. S. Fire wrote:

"This is to inform you that we will continue to diligently defend your client, but, in the event punitive damages are awarded, it will be necessary for Mr. Uriguen to pay those out of his own pocket since they will not be paid by his liability insurance carrier.

"We have attempted in every way possible and to the best of our ability to eliminate from this case the element of punitive damages, but at this point have been unsuccessful in doing so. If Mr. Uriguen desires to employ you at his own expense to defend this case in connection with the punitive damage items, you are invited to do so and we will assist you in every way possible."

Later, counsel for U. S. Fire wrote counsel for Uriguen Corporation:

"Pursuant to our telephone conversation of today, you will find enclosed herewith a copy of a letter dated August 6th which we have today received from counsel for plaintiff in the above matter.

"You will note the offer of settlement of $100,000 general and special damages and $50,000 punitive damages. We are forwarding a copy to the insurance company.

"If you have any thoughts on how best to conduct the case from this point, we would be happy to discuss it with you at a mutually convenient time."

Later still, counsel for U. S. Fire wrote counsel for Uriguen Corporation:

"It would appear that plaintiffs are making it more difficult to attempt to negotiate settlement in this case. Enclosed herewith are copies of Motion to Amend Amended Complaint and Notice of Hearing, all of which indicates plaintiffs are attempting to obtain an Order from the Court to increase the prayer for punitive damages from $50,000.00 to $150,000.00.

"Since you are representing Abbie Uriguen Oldsmobile Buick, Inc., individually, in this case, we thought you should be immediately advised of this Motion to Amend. We intend to resist it, but as

we have repeatedly advised you and Mr. Uriguen our insurance company client, the liability carrier for Mr. Uriguen, cannot pay any award of punitive damages in the event plaintiff obtains such an award, since our research leads us to the conclusion that such payment by insurance companies would be against public policy."

U. S. Fire settled both suits in November of 1971. That settlement did not specifically set forth any allocation between actual or punitive damages but merely released all defendants "of and from all claims, demands, actions or causes of action, judgments, costs, both known and unknown which the undersigned have or may hereafter have on account of, or in any way growing out of a certain accident * * *."

Uriguen Corporation then brought the instant action seeking to recover its attorneys fees on the theory that U. S. Fire violated I.C. § 41–1839 when it prospectively denied any liability for any award which might be made for punitive damages.[1] The district court entered summary judgment for U. S. Fire on the grounds that I.C. 41–1839 did not apply; that Uriguen was not in any sense obliged to retain additional legal counsel, and, that the entire issue of U. S. Fire's obligation to cover punitive damage claims was mooted by the settlement of the two suits against Uriguen.

At the time of the accident Uriguen Corporation was covered by a U. S. Fire policy containing the following pertinent provision:

"The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

Coverage C. bodily injury or
Coverage D. property damage
to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance, or use, including loading or unloading, of any automobile . . . ."

We note that such policy provision is identical with policy provisions in cases which we will discuss herein. This case focuses on U. S. Fire's prospective denial of any coverage of a punitive damage award. We consider first Uriguen's assertion that the trial court erred in adopting U. S. Fire's contention that public policy forbids insurance coverage of punitive damage awards.

This is a question of first impression in Idaho. There are only a few cases dealing with this question in other jurisdictions and the courts have sharply divided regarding public policy on insuring against punitive damages.

■ Idaho follows the majority view that the public purpose behind punitive damages is both to punish and to deter. Cox v. Stolworthy, 94 Idaho 683, 496 P.2d 682 (1972); Boise Dodge, Inc. v. Clark, 92 Idaho 902, 453 P.2d 551 (1969); Jolley v. Puregro Co., 94 Idaho 702, 496 P.2d 939 (1972). We note, however, that none of such cases are applicable to the situation at bar since all were based on deliberate and intentional acts of the tortfeasor. For example in *Jolley* the acts were "deliberate, wilful, malicious and intentional and for the sole purpose of harassing."

There is authority that punitive damage awards are covered by automobile liability insurance. For example, in 7 Appleman, Insurance Law and Practice, § 4312 (1972 Supp.) it is stated:

"In a recent case the court concluded that under applicable state law an award

---

1. **I.C. 41–1839. Allowance of attorney fees in suits against insurers.**—(1) Any insurer issuing any policy, certificate or contract of insurance, surety, guaranty or indemnity of any kind or nature whatsoever, which shall fail for a period of thirty (30) days after proof of loss has been furnished as provided in such policy, certificate or contract, to pay to the person entitled thereto the amount justly due under such policy, certificate or contract, shall in any action thereafter brought against the insurer in any court in this state for recovery under the terms of the policy, certificate or contract, pay such further amount as the court shall adjudge reasonable as attorney's fees in such action.

of punitive damages against an insurer would be improper. It is submitted that this extension of a rule of public policy, originally limited to acts intentionally caused, is unsound. The facts of the cited case indicate that defendant's conduct was not wilful. He had no present intent to injure plaintiff. Had his act been wilful, in the sense that he intended injury to the plaintiff, the insurer would have been completely absolved of liability. It seems strangely inconsistent for an insurer, in one breath, to admit liability for compensatory damages, and then to deny liability for that part of an award claimed attributable to reckless or wanton conduct. Mr. Appleman's arguments apply with equal force to punitive damages. In any event a court should not aid an insurer which fails to exclude liability for punitive damages. Surely there is nothing in the insuring clause that would forewarn an insured that such was to be the intent of the party."

Likewise in 15 Couch on Insurance 2d, § 56.27 (1966), it is stated:

"Recovery under automobile liability policies for punitive or exemplary damages awarded against the insured have generally been sustained at least in the absence of injuries intentionally inflicted by the insured. On this basis it has been held that damages recovered by the injured party against the insured which are in part compensatory and in part punitive are liabilities imposed by the law for damages within the meaning of the automobile liability policy, whether punitive damages were awarded on the basis of gross negligence and not of intentional injuries."

*See also:* 7 Am.Jur.2d, Automobile Insurance § 196, p. 538.

However, the contrary rule has also found support from the commentators. *See:* Note, Insurance Coverage and the Punitive Award in the Automobile Accident Suit, 19 U.Pitt.L.Rev. 144 (1957); Note, Exemplary Damages in the Law of Torts, 70 Harv.L.Rev. 517 (1957); Comment, Punitive Damages and Their Possible Application in Automobile Accident Litigation, 46 Va.L.Rev. 1036 (1960); Note, Automobile Liability Insurance and Punitive Damages, 39 Temple L.Q. 459 (1966); Gonsoulin, D.J. Is an award of Punitive Damages Covered Under an Automobile or Comprehensive Liability Policy?, 22 Southwestern L.J. 433 (1968).

U. S. Fire urges adoption of the philosophy expressed by Judge Wisdom in Northwestern Nat. Cas. Co. v. McNulty, 307 F. 2d 432 (5th Cir. 1962). Uriguen Corporation, on the other hand, urges us to adopt the view expressed by the Tennessee court in Lazenby v. Universal Underwriters Ins. Co., 214 Tenn. 639, 383 S.W.2d 1 (1964).

In *McNulty,* Judge Wisdom stated:

" . . . It appears to us that there are especially strong public policy reasons for not allowing socially irresponsible automobile drivers to escape the element of personal punishment in punitive damages when they are guilty of reckless slaughter or maiming on the highway. It is no answer to say, society imposes criminal sanctions to deter wrongdoers; that it is enough when a civil offender, through insurance, pays what he is adjudged to owe. A criminal conviction and payment of a fine to the state may be atonement to society for the offender. But it may not have a sufficient effect on the conduct of others to make the public policy in favor of punitive damages useful and effective. * * * We are sympathetic with the innocent victim here; perhaps there is no such thing as money damages making him whole. But his interest in receiving noncompensatory damages is small compared with the public interest in lessening the toll of injury and death on the highways; and there is such a thing as a state policy to punish and deter by making the wrongdoer pay." 307 F.2d at 441-442 (1962).

Judge Gewin filed a special concurrence in *McNulty* stating:

"All of us are concerned with the high death toll and personal injuries occur-

ring on the highways, but I am somewhat skeptical that the prohibition of insurance against liability for punitive damages will accomplish the results expected by the majority. * * *. If the criminal penalties provided by such statutes fail to deter the wrongdoers, I seriously doubt that closing the market to insurance coverage will do so. As a matter of fact, it is my judgment that the opposite result will follow." 307 F. 2d at 444.

We point out two facets of *McNulty*. First, the federal court was attempting to predict the public policy of Florida and Virginia which at that time had not been announced by the state courts.

Secondly:

"The accident giving rise to the suit occurred in Florida. Smith, a drunken driver, traveling at eighty miles an hour or faster, weaving from side to side of the road tried to pass the automobile that plaintiff Edward McNulty was driving. He made the attempt where it was impossible to pass or he completely lost control of his car. Smith's car smashed into the rear of McNulty's car. Without stopping to render aid, Smith fled the scene of the accident. He was arrested twelve miles down the highway when his car ran out of gas." 307 F.2d at 433.

In support of the *McNulty* theory *See*: Universal Indem. Ins. Co. v. Tenery, 96 Colo. 10, 39 P.2d 776 (1934); Crull v. Gleb, 382 S.W.2d 17 (Mo.App.1964); Nicholson v. American Fire & Cas. Co., 177 So.2d 52 (Fla.App.1965); American Surety Co. v. Gold, 375 F.2d 523 (10th Cir. 1966); Annotation 20 A.L.R.3d 343; LoRocco v. N. J. Mfrs. Indem. Ins. Co., 82 N.J.Super. 323, 197 A.2d 591 (1964); Esmond v. Liscio, 209 Pa.Super. 200, 224 A.2d 793 (1966). *See also*: Tedesco v. Maryland Cas. Co., 127 Conn. 533, 18 A.2d 357 (1941); dissent of Fogelman, J. in Southern Farm Bur. Cas. Ins. Co. v. Daniel, 246 Ark. 849, 440 S.W.2d 582 (1969).

The leading case contrary to *McNulty* is Lazenby v. Universal Underwriters Ins.

*Co., supra*. Tennessee, like Idaho, follows the majority view that the public purpose behind punitive damages is both to punish and to deter. The *Lazenby* court stated:

"We accept as common knowledge, the fact death and injuries on our highways and streets is a very serious problem and such is a matter of great public concern. We further accept, as common knowledge, socially irresponsible drivers, who by their action and operation of motor vehicles, could be liable for punitive damages are a great part of this problem. We, however, are not able to agree the closing of the insurance market, on the payment of punitive damages, to such drivers who would necessarily accomplish the result of deterring them in their wrongful conduct. This State, in regard to the proper operation of motor vehicles, has a great many detailed criminal sanctions, which apparently have not deterred this slaughter on our highways and streets. Then to say the closing of the insurance market, in the payment of punitive damages, would act to deter guilty drivers would in our opinion contain some element of speculation.

"*Second*. The language in the insurance policy in the case at bar, which is similar to many types of liability policies, has been construed by most courts, as a matter of interpretation of the language of a policy, to cover both compensatory and punitive damages. Since most courts have so construed this language in the policy, *we think the average policy holder reading this language would expect to be protected against all claims, not intentionally inflicted*." (Emphasis supplied) 383 S.W.2d at 5.

The theory of the *Lazenby* case is reflected in Employers Ins. Co. of Alabama v. Brock, 233 Ala. 551, 172 So. 671 (1937); Maryland Cas. Co. v. Baker, 304 Ky. 296, 200 S.W.2d 757 (1947); Carroway v. Johnson, 245 S.C. 200, 139 S.E.2d 908 (1965); Threshermen & Farmers Mut. Cas. Co. v. Thornton, 244 F.2d 823 (4th Cir. 1957); Southern Farm Bur. Cas. Ins.

Co. v. Daniel, 246 Ark. 849, 440 S.W.2d 582 (1969); Price v. Hartford Accident & Indem. Co., 108 Ariz. 485, 502 P.2d 522 (1972).

We point out that the policy provisions herein make no distinction as between actual and punitive damages. Punitive damages are not specifically excluded from the policy language. Under the provision of the policy the company promises to pay on behalf of the insured *all* sums which the insured shall. be legally obligated to pay as *damages* caused by the use of any automobile. The law is clear in Idaho that insurance policies are to be construed most liberally in favor of recovery. Shields v. Hiram C. Gardner, Inc., 92 Idaho 423, 444 P.2d 38 (1968). Since policies are written by companies without any arms length bargaining between the parties all ambiguities are resolved in favor of the insured. Stephens v. New Hampshire Ins. Co., 92 Idaho 537, 447 P.2d 14 (1968); Scharbach v. Continental Cas. Co., 83 Idaho 589, 366 P.2d 826 (1961); Rollefson v. Lutheran Brotherhood, 64 Idaho 331, 132 P.2d 758 (1943). Clearly absent any public policy to the contrary, this controversy must be resolved in favor of the insured.

Insofar as public policy is concerned we reject *McNulty* and adopt the *Lazenby* approach. Judge Gewin stated in *McNulty*:

"The borderline between wilful and wanton injury and injury as the result of simple negligence is often a hairline distinction. A *sufferer* gains little solace from the doubtful and unpredictable uncertainty of judges and juries as they undertake to place the conduct of the wrongdoer in the categories of wilful, intentional, wanton, gross, reckless or other categories of negligence. Those companies who do not wish to sell such protection may withdraw their product from the market * * *."

  *      *      *      *      *      *

"It is also quite apparent that my brothers of the majority are looking at this question from one direction only—from the point of view of the nature of the wrong which caused the injury. What about the injured party? Implicit in the entire field of tort liability and insurance law is the concept of furnishing some protection to those who are injured. Public policy is involved here to a greater extent. What will society do with the thousands who are injured daily and to some of whom punitive damages are awarded." 307 F.2d at 444.

We turn now to a consideration of whether U. S. Fire's refusal to cover any award of punitive damages constituted a breach of the insurance contract. The same question was treated in Boise Motor Car Co. v. St. Paul Mercury Indem. Co., 62 Idaho 438, 112 P.2d 1011 (1941). In that case an insurance carrier had denied that its policy provided coverage to its insured for damages arising out of an automobile accident since the automobile in question was driven by a person under 16 years of age. In *Boise Motor*, like the case at bar, correspondence was exchanged which indicated that although the insurance carrier had denied coverage and would defend under a "reservation" the insured was tendered "the right to associate your own attorney with me in the defense of this case, you however, to pay your own attorney such fee as he shall charge." And " * * * in this suit the St. Paul Indem. Co. will assume no liability under the terms of said policy nor will any appeal be made from any decision of the district court."

Boise Motor retained its own attorneys and thereafter its insurance carrier settled the litigation. The insured brought action to compel payment of his attorneys fees. On appeal the Court stated:

"The insurance contract, if of any value, required definite and unequivocal defense, else by continued lack of definite committal the insured might have been tolled into a cul-de-sac. This continued evasion, therefore, on the face of respondent's own correspondence was, as alleged in the complaint, not a 'defense of the suit as required by the policy.' "

  *      *      *      *      *      *

"The company's attitude and contention * * *, though adroit and clever would have absolved it from liability at the insured's expense, and incorrectly attempted to place upon the insured the burden of making a choice, since if the insured had entirely taken over the litigation the company might have been freed. The insured at all times, though legitimately protecting itself was attempting to compel the company to live up to its contract, which gave it no option to interminably straddle the question of its responsibility.

\* \* \* \* \* \*

"Respondent elected to go forward with defense of the Heard suit after having notice appellant would not consent to reservation of respondent's right to withdraw, and its continued assertion of such right of withdrawal thereafter was a breach of its insurance contract and created a hazard, to protect itself from which, appellant was justified in employing attorneys. A fee paid the attorneys is thus properly chargeable against respondent." (citations omitted) 62 Idaho 447 at 449, 112 P.2d 1011 at 1016.

*Boise Motor* was cited as authority for the decision in Socony-Vacuum Oil Co. v. Continental Cas. Co., 144 Ohio St. 382, 59 N.E.2d 199 (1945). Therein an insurance carrier denied liability coverage for an accident but indicated that it would furnish a defense of the action and recommended that Socony-Vacuum secure its own counsel. In correspondence the insurance carrier stated: "Undoubtedly, under the terms of the contract of insurance, we owe you the duty of defending you, but under the circumstances it may be that since there is a possibility of a failure of protection for the reasons hereinbefore set forth, you may desire to associate with us in your defense your personal counsel."

Thereafter Socony-Vacuum employed its own attorneys, they defended the suit, and Socony-Vacuum prevailed. Socony-Vacuum then sought its attorneys fees in an action against the insurance carrier. On appeal the Ohio Supreme Court stated:

"Accordingly, in respect to coverage the situation that confronted the insurer in determining its course in defending the Hopper suit related to potential rather than ultimate liability for indemnification.

\* \* \* \* \* \*

"Thus in making defense the interest of the insurer came into conflict with the interest of the insured. The insurer sought to avoid any liability to indemnify insured for recoverable damages by giving notice of claimed nonliability, inviting the insured to employ counsel of its own choice for its own protection and allowing them to participate in the case and by attempting at the same time to perform its (insurer's) conceded contractual obligation to defend by requiring its own counsel to keep control of the defense at all times.

"As a result, the insured was confronted with a hazard which justified it in employing its own counsel for its protection —protection the insurer plainly indicated it would not give. The insured met the hazardous situation by employing counsel under protest and notifying the insurer that it must bear the expense * * *.

"As the hazard was created by the action of the insurer in placing itself in a position in which it could not and did not fully and completely perform its contractual obligation to make defense, the insured is entitled to recover reasonable attorney fees, and proper expenses on the ground that insurer breached its contract. Boise Motor Car Co. v. St. Paul Mercury Indem. Co., 62 Idaho 438, 112 P.2d 1011."

59 N.E.2d at 204–205.

*See also*: Coast Lumber Co. v. Aetna Life Ins. Co., 22 Idaho 264, 125 P. 185 (1912); Pendlebury v. Western Cas. & Sur. Co., 89 Idaho 456, 406 P.2d 129 (1965); 7A Appleman, Insurance Law and Practice, § 4691 (1962).

In the instant case the insurance carrier created a substantial hazard to Abbie Uriguen Oldsmobile Inc. When the personal injury actions were filed against it Abbie Uriguen faced a potential liability of $150,000 for punitive damages arising out of an accident causing very serious personal injuries. We have already decided herein that the insurance afforded coverage for punitive damages. The insurance carrier suggested that Uriguen employ its own counsel to defend its interest which the insurance carrier wrongfully refused to cover under its policy. It is both impractical and illogical to look back in time as did the trial judge and say that since the *McNulty* case was settled there was no necessity for employing counsel.

▇▇▇▇ In the instant case U. S. Fire breached its contractual obligation to

"* * * defend any suit against the insured seeking damages against the insured on account of such bodily injury or property damage."

when it notified Uriguen that it would not cover any award of punitive damages. Such refusal constituted a breach of the insurance contract and attorneys fees are a proper element of damage arising out of such breach. Boise Motor Co. v. St. Paul Mercury Indem. Co., *supra*; Pendlebury v. Western Cas. & Sur. Co., *supra*; Socony-Vacuum Oil Co. v. Continental Cas. Co., *supra*. Uriguen is entitled to recover the reasonable attorneys fees occasioned by U. S. Fire's breach of contract and further is allowed its attorneys fees incurred in pursuing the present action, both at trial and on appeal.

The judgment of the district court is reversed and remanded with instructions to determine the amount of Uriguen's attorneys fees in both this action at trial and on appeal and the initial defense of the punitive damage claims and to enter judgment for Uriguen accordingly. Costs to appellant.

McQUADE, McFADDEN and BAKES, JJ., concur.

DONALDSON, Chief Justice (concurring specially).

If, as the majority opinion seems to indicate, the function of punitive damages is "to punish and to deter," I would have difficulty concurring with the view that public policy does not preclude recovery against a liability insurance company for punitive damages awarded against the insured. However, this Court's most recent decision, in discussing the purposes of punitive damages, states that "we feel that the courts in these civil cases should be motivated primarily by a purpose of deterrence [of the defendant and others from engaging in similar conduct in the future] and not by a purpose of punishment. In other words, the assessment of exemplary damages should be prompted by the court's or jury's desire to assure, to the extent possible via the imposition of a monetary penalty, that similar conduct does not occur in the future. Punishment, per se, should be left to the criminal law." Jolley v. Puregro Co., 94 Idaho 702, 708-709, 496 P.2d 939, 945 (1972). In addition, our latest cases also recognize a collateral public policy reason for awarding punitive damages: to encourage plaintiffs to bring suit against defendants who have engaged in antisocial conduct. *Id.* at 708, 496 P.2d 945; Cox v. Stolworthy, 94 Idaho 683, 691, 496 P.2d 682 (1972).

While insurance coverage for punitive damages *may* tend to defeat the predominant public policy purpose of deterring similar antisocial conduct, it unequivocally promotes the collateral purpose of encouraging plaintiffs to bring suit against defendants who have engaged in such conduct and who are covered under liability insurance policies which fail to exclude punitive damages. Under these circumstances, I am unable to conclude that public policy precludes liability insurance coverage for punitive damages.

. Once the public policy question is determined in favor of the insured, I feel that the remainder of the majority opinion follows from that determination, and I concur with the reasoning expressed therein.